UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

    Plaintiff,

  v.

Kimberly Susan Latham,

    Defendant.

Criminal No. 12-25 (ADM/FLN)

**REPORT AND RECOMMENDATION**

David P. Steinkamp, Assistant United States Attorney, for Plaintiff.
Caroline Durham, Assistant Federal Defender, for Defendant.

**THIS MATTER** came before the undersigned United States Magistrate Judge on February 15, 2012 on Defendant's Motion to Suppress Eyewitness Identification (ECF No. 9) and Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 10). At the hearing, the Government offered testimony from Tracy Armistead and Andrew Gardner. Both parties submitted additional briefing after the hearing. (ECF Nos. 23 and 24.) The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons set forth below, the Court recommends that Defendant's motions should be **DENIED**.

## I. FINDINGS OF FACT

### A. Testimony of Tracy Armistead

Tracy Armistead, a sergeant with the Chisago County Sheriff's Office, offered testimony regarding an interview she conducted with A.M.A. on November 21, 2011. The interview occurred in a conference room at the Chisago County Government Center. A.M.A. is a fourteen-year-old girl

1

that ran away from her mother's home in Chisago City, MN on or about October 12, 2011. A.M.A. returned home on or about November 13, 2011. A.M.A. ran away with D.R.W., another underage girl who was still missing when Armistead interviewed A.M.A. The purpose of the interview was to gather information on D.R.W.'s whereabouts.

A.M.A. told Armistead that she and D.R.W. met a woman while walking down a street in north Minneapolis. The woman's name was "Kim." Kim gave the girls a card and said to give her a call if they needed help. A.M.A. and D.R.W. called Kim and stayed with her at approximately fifteen different hotels around the metropolitan area. A.M.A. admitted that the girls used drugs during that time. According to A.M.A., Kim was a self-employed prostitute and taught the girls how to become prostitutes. A.M.A. also told Armistead that Kim did not like her and kicked her out on two separate occasions. A.M.A. returned home after Kim kicked her out for the second time. Armistead testified that she did not know that A.M.A. had been involved in prostitution prior to the interview and that A.M.A. was not under any threat of arrest.

A.M.A. provided Armistead with a physical description of Kim and said that Kim went by the name "Sarah" on backpage.com. Backpage.com is a website that contains listings for escort services. The site has a search function, and the ads often include images. Armistead and another investigator searched backpage.com for ads with the name "Sarah." Armistead does not recall precisely how many ads were generated by her search for "Sarah," but she found one listing with a photo that matched A.M.A.'s description of Kim. Government's Exhibit 3 is a screen shot of that listing. Government's Exhibit 4 is a screen shot an enlarged image of one of the photographs attached to the listing.

After Armistead located the listing matching A.M.A.'s description of Kim, she called a social worker to bring A.M.A. to the room in which the computer was located. A.M.A., A.M.A.'s mother,

a social worker, and Armistead were all present in the room as Armistead pulled up Exhibit 4 on the computer screen and asked A.M.A. "is this her?" A.M.A. looked at the photo and immediately said "that's Kim."

### B.     Testimony of Andrew Gardner

On or about November 29, 2011, Andrew Gardner, a detective with the Minnetonka Police Department, visited Renee Maddox, the manager of the Cedar Ridge apartment complex in Minnetonka, MN. Gardner told Maddox that he was in search of a runaway juvenile. Gardner had previously saved two images on his smartphone that he believes were sent to him by Armistead via e-mail. The first photograph depicted D.R.W., and the second photograph was Exhibit 4.[1] The manager viewed the images on Gardner's phone. She did not recognize the photo of D.R.W., but she immediately recognized the individual in the second photograph. Maddox identified the individual as "Kim Latham" and said that she lived in apartment #102.

On February 10, 2011, a few days before the hearing on this matter, Gardner visited Maddox again to ask her about her contacts with Latham. Maddox stated that she had multiple personal interactions with Latham between August 1, 2011 and November 29, 2011. According to Maddox, the two first met when Latham moved into the building in August 2011. Maddox gave Latham a walk-through of the apartment and the apartment complex. Maddox also personally received three rent payments from Latham and spoke with Latham on separate occasions about a new job Latham had received and a tattoo she was thinking about getting. Gardner concluded his visit by inspecting a copy of the file associated with Latham's unit and found that it contained documents with

---

[1]   Gardner testified that he is no longer in possession of the phone he used on the day he visited Maddox and that he did not preserve the digital photographs that were shown to Maddox. He did testify, however, that Exhibit 4 is an accurate duplicate of the second photograph that he showed Maddox.

Latham's name on them.

## II. CONCLUSIONS OF LAW

### A. The identifications are admissible.

Defendant contends that the identifications by A.M.A. and Renee Maddox must be suppressed because the identification procedures used by the officers were impermissibly suggestive and the identifications were not reliable.

To determine whether the Due Process Clause of the Fourteenth Amendment requires the suppression of an identification, the first inquiry is whether "law enforcement officers use[d] an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, 132 S.Ct. 716, 724 (2012). If the identification procedure was indeed suggestive and unnecessary, then the second inquiry is whether "the improper police conduct created a substantial likelihood of misidentification." *Id.* The "reliability of the eyewitness identification is the linchpin of that evaluation . . . ." *Id.* at 725. In determining the reliability of the identification, the Court must consider the "opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of h[er] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

#### 1. A.M.A.'s identification is admissible.

The use of a single photograph in an identification is not always unnecessarily suggestive. *United States v. Dobbs*, 449 F.3d 904, 909-10 (8th Cir. 2006). On one hand, the Eighth Circuit has held it is not unnecessarily suggestive to show a single photograph of a suspect to someone "already familiar" with the suspect, such as the suspect's mother or live-in girlfriend. *Id.* On the other hand, the Eighth Circuit has also held that it *is* unnecessarily suggestive to show a single photograph of

4

a suspect to an eyewitness whose only interaction with the suspect was brief and stems from having observed the crime with which the suspect is charged. *See*, *e.g., Ruff v. Wyrick*, 709 F.2d 1219, 1220 (8th Cir. 1983). A.M.A. falls somewhere in-between these two types of witnesses. A.M.A. did not know Kim prior to meeting her on the streets of Minneapolis, but she did spend at least two weeks with Kim and stayed with her in various hotels throughout the metropolitan area. The Court assumes, without deciding, that showing A.M.A. a single photograph of "Sarah" was unnecessarily suggestive.

Having assumed the identification procedure used by Armistead was unnecessarily suggestive, the Court concludes that A.M.A.'s identification is nonetheless reliable. A.M.A. had a substantial opportunity to observe Kim: she spent several days with her. Although A.M.A. allegedly took drugs during that time, she was likely attentive to Kim's appearance because Kim was teaching her how to become a prostitute. The backpage.com ad appeared as A.M.A. described it: an individual named "Sarah" posted photographs of herself that matched the description of Kim that A.M.A. had provided. A.M.A. immediately recognized the individual in the photograph as Kim and last saw her approximately one week before she made the identification, a relatively brief period of time. For these reasons, the Court finds that A.M.A.'s identification is reliable and that the identification procedure used by Armistead did not create a substantial likelihood of misidentification. A.M.A's identification is admissible.

### 2. Maddox's identification is admissible.

Under these circumstances, it was not unnecessarily suggestive for Gardner to show Maddox a single photograph of "Kim Latham." Gardner and Maddox had no reason to believe that the woman in the photograph was suspected of a crime. Gardner knew nothing about the woman other than that she may have information on the whereabouts of a runaway juvenile. Maddox did not

witness a crime. In short, there was nothing for Gardner to suggest or for Maddox to infer. Maddox's identification is admissible.

**B.   The search warrants were supported by probable cause.**

Defendant contends that any evidence seized pursuant to the two search warrants in this case must be suppressed because the warrants were not supported by probable cause.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A valid search warrant must be supported by an affidavit providing the signing judge with a substantial basis for determining the existence of probable cause to believe a search would uncover evidence of wrongdoing. *Illinois v. Gates*, 462 U.S. 213, 236-39 (1983). Probable cause is defined as a "fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. A supporting affidavit that consists of bare conclusions or conclusory allegations cannot support a finding of probable cause. *Id.* An informant's veracity, reliability, and basis of knowledge are "highly relevant" in determining whether a supporting affidavit establishes probable cause. *Alabama v. White*, 496 U.S. 325, 328 (1990).

Whether probable cause exists depends on the totality of the circumstances. *See Gates*, 462 U.S. at 238; *United States v. Gabrio*, 295 F.3d 880, 882-83 (8th Cir. 2002). In evaluating the existence of probable cause, courts do not consider each piece of information independently, but instead consider the cumulative meaning of all facts taken together. *See United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002).

**1.   The search warrant for the apartment was supported by probable cause**.

The affidavit supporting the application for a search warrant as to Latham's apartment

describes the following information: on October 22, 2011, two underage girls named A.M.A. and D.R.W. were reported missing. Law enforcement believed that the girls ran away from home. On November 16, 2011, A.M.A. was admitted to the emergency room of a hospital in St. Paul and reported that she had been sexually assaulted. During an interview with law enforcement, A.M.A. said that she and D.R.W. met a woman in Minneapolis named Kim Latham who offered them a place to stay if they needed one. A.M.A. and D.R.W. eventually contacted Latham, who picked them up in a vehicle and brought them back to her apartment. Latham offered the girls drugs and alcohol. After some days passed, Latham told the girls they needed to pay her in order to continue staying there. Latham arranged for A.M.A. to have sex with men on three separate occasions and offered to give her $180 for each encounter. A.M.A. refused, so Latham told her to pay her way or leave. A.M.A. left Latham's residence, but D.R.W. remained.

Law enforcement later learned that Latham advertised A.M.A. as "Alyssa" on backpage.com. The investigating officers searched backpage.com for ads containing the name "Alyssa" and found one ad featuring a "young looking" female. The investigating officers also found a backpage.com ad that they believed belonged to Latham. The "Alyssa" ad and the "Latham" ad contained identical phone numbers. On November 29, 2011, law enforcement called the number and arranged for an undercover officer to meet Alyssa around 3:00pm. The woman who answered the phone told the officer to go to the Cedar Ridge apartments in Minnetonka and park in front of the 10111 building. As the undercover officers approached the apartment complex, they observed a young female matching the description of D.R.W. The female was seen walking through the parking lot with an adult male. The officers identified the female as D.R.W. and took her into custody. D.R.W. was in possession of a key to apartment #102 and Latham's photo identification.

D.R.W. spoke with law enforcement and corroborated the information that A.M.A. had

provided them. In addition, D.R.W. told law enforcement that she had been sent out to meet men on five or six occasions. According to D.R.W., Latham knew the girls were underage and instructed them to inform the men that they were 18 years old. D.R.W. told law enforcement that the telephone number listed in both backpage.com ads rings into Latham's apartment. The investigating officers then showed D.R.W. two different backpage.com ads. D.R.W. identified "A.M.A." in one ad and believed that the second ad contained photographs that were taken in Latham's apartment. D.R.W. did not recognize the female in the second ad. Both ads are attached to the affidavit. Law enforcement later searched the Minnesota Department of Motor Vehicle's records and discovered that Latham's address was listed on her driver's license as 10101 Cedar Lake Road apartment #102.

These facts, taken together, establish more than a "fair probability" that evidence related to the prostitution of underage girls would be found in Latham's apartment. The Court concludes, given the totality of the circumstances described in the affidavit, that probable cause existed to support the issuance of the search warrant. The evidence seized during the search of Latham's apartment is admissible.

**2.    The search warrant for the two cell phones seized in the apartment was supported by probable cause.**

The affidavit attached to the search warrant application for the two cell phones reincorporates the information summarized above. Those facts, taken together, establish more than a "fair probability" that evidence related to the prostitution of underage girls would be found in the electronic information stored on the two cell phones seized during the search of Latham's apartment. The Court concludes, given the totality of the circumstances described in the affidavit, that probable cause existed to support the issuance of a search warrant as to the two cell phones. The evidence seized during the search of the those phones is admissible.

### III.   RECOMMENDATION

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Eyewitness Identification (ECF No. 9) should be **DENIED**; and

2. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 10) should be **DENIED**.

DATED: March 8, 2012                              *s/ Franklin L. Noel*
                                                  FRANKLIN L. NOEL
                                                  United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **March 22, 2012**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **March 22, 2012,** a complete transcript of the hearing.
This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.